**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BILLY RAY CHILES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-03516-L-BH |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **COMMISSIONER OF** | § | |
| **SOCIAL SECURITY** | § | |
| | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed January 9, 2013 (doc. 17), and *Defendant's Motion for Summary Judgment*, filed February 8, 2013 (doc. 18). Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **DENIED**, Defendant's motion should be **GRANTED**, and the case should be wholly **AFFIRMED.**

**I. BACKGROUND**[1]

**A.    Procedural History**

Billy Ray Chiles (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (R. at 10–18.) On May 19, 2010, Plaintiff applied for SSI,

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

alleging disability beginning May 28, 2002, due to acquired immune deficiency syndrome (AIDS)[2], pneumonia, left hand injury, and depression. (R. at 10 and 96.) His claim was denied initially and upon reconsideration. (R. at 10, 46, 54.) He requested a hearing before an Administrative Law Judge (ALJ), and one was held on March 8, 2011. (R. at 10, 23–42, 57.) On April 12, 2011, the ALJ issued his decision finding Plaintiff not disabled. (R. at 7–18.) The Appeals Council denied his request for review on June 26, 2012, and the ALJ's decision became the final decision of the Commissioner. (R. at 1–6.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. §405(g). (doc. 1.)

**B.  Factual History**

    **1.  Age, Education, and Work Experience**

Plaintiff was born on August 2, 1968; he was 42 years old at the time of the hearing before the ALJ. (R. at 25–26.) He has a GED and past relevant work experience as a warehouse worker. (R. at 17, 26.)

    **2.  Medical Evidence[3]**

        a.  <u>Evidence Prior to Relevant Disability Period</u>

On March 24, 2002, while incarcerated at Texas Department of Corrections (TDC), Plaintiff was admitted to Northwest Texas Healthcare System (NTHS). (R. at 206.) He was experiencing shortness of breath, fever, a dry cough, chest pain, vomiting, loss of appetite, and recent weight loss.

---

[2] "A deficiency of cellular immunity induced by infection with the human immunodeficiency virus (HIV-1) and characterized by opportunistic diseases, including Pneumocystis jiroveci (formerly carinii) pneumonia . . . ." *Stedman's Medical Dictionary* 40 (28th ed. Lippincott Williams & Wilkins, 2006).

[3] Because this action is ultimately resolved based on Plaintiff's HIV infection, a physical impairment, a recitation of the psychological and psychiatric evidence is unnecessary.

(R. at 206–10.)  He told Kevin Allen, M.D., the admitting physician, that he had been tested for AIDS[4] two years before and the results were "negative." (R. at 210.)  Chest X-rays taken that day revealed "obvious diffuse interstitial infiltrates." (R. at 210.)  Dr. Allen initially diagnosed him with "[a]cute respiratory distress secondary to atypical pneumonia." (*Id.*)  The discharge diagnosis was atypical pneumonia—"possibly" pneumocystis carinii pneumonia (PCP)[5], human immunodeficiency virus (HIV) "results pending," and low CD4 count (22)[6] and low CD8 ratio.[7]  (R. at 206.)

Plaintiff was again admitted to NTHS on April 17, 2002. (R. at 193–96, 212–14.)  Dr. Allen observed that X-ray's of Plaintiff's chest were "[o]bviously markedly abnormal with diffuse infiltrates [in] both lung fields" and opined that his condition was "probably atypical pneumonia, [PCP]." (R. at 197.)  The differential diagnoses were AIDS, pneumonia—"most likely" PCP, status post respiratory failure, hyponatremia, and oral thrush. (R. at 193.)  The next day, two other

---

[4] "A deficiency of cellular immunity induced by infection with the human immunodeficiency virus (HIV-1) and characterized by opportunistic diseases, including Pneumocystis jiroveci (formerly carinii) pneumonia . . . ." *Stedman's Medical Dictionary* at 40.

[5] PCP "result[s] from infection with Pneumocystis jiroveci, frequently seen in the immunologically compromised, such as people with AIDS . . . ." *Stedman's Medical Dictionary* at 1524.  The most common symptoms are dry cough, fever, night sweats, and dyspnea.  *Id.*  PCP is generally treated with trimethoprim (TMP) and sulfamethoxazole (SMX) for 14 to 21 days; the success rate for treatment with TMP-SMX or pentamidine is between 60 and 80%.  *See* National Center for Biotechnology Information, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC105593/ (last visited January 6, 2014).

[6] "CD4 cells (also known as CD4+ T cells) are white blood cells that fight infection . . . These are the cells that HIV kills. As HIV infection progresses, the number of these cells declines . . . Usually, when a person with low CD4 cells starts HIV medicines, the CD4 cell count increases as the HIV virus is controlled. Most but not all people will experience an increase in CD4 cell with effective HIV treatment." U.S. Department of Veterans Affairs, CD4 Count (or T-cell count), http://www.hiv.va.gov/patient/diagnosis/labs-CD4-count.asp. (last visited January 6, 2014).

[7] "Lymphocytes are a type of white blood cell in your immune system. This test looks at two of them – CD4 and CD8. CD4 cells lead the fight against infections, and CD8 cells can kill cancer cells and other invaders . . . This test looks at the ratio of CD4 cells to CD8 cells. The ratio tells [the] doctor how strong [the patient's] immune system is and helps predict how likely [he or she is] to develop a crippling infection." University of Rochester Medical Center, CD4-CD8 Ratio, http://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=167&ContentID=cd4_cd8_ratio (last visited January 6, 2014).

physicians interpreted Plaintiff's X-rays and opined that his condition was "possible PCP pneumonia." (R. at 199, 214.) He was administered Bactrim (a combination drug of TMP-SMX) intravenously for PCP, and was also "treated [] empirically for possible bacterial pneumonia with [antibiotics]." (R. at 214.) The following week, Plaintiff tested positive for HIV, and a pathological report indicated that a sputum[8] culture was "negative for diagnostic" of PCP. (R. at 200, 207.)

On May 2, 2002, Plaintiff returned to NTHS complaining of shortness of breath, hypoxia, and difficulty breathing. (R. at 202.) Doctors diagnosed "pneumothorax" (a collapse) of his left lung and inserted a chest tube to re-expand his lung. (R. at 202.) Upon discharge, the diagnoses were PCP and HIV infection with AIDS. (*Id.*)

A few weeks later, Plaintiff was admitted to Parkland Health and Hospital System (Parkland). (R. at 175.) Chest X-rays showed "diffuse interstitial infiltrates . . . predominantly in the perihilar regions" of his lungs, which "may represent [an] opportunistic infection such as PCP." (R. at 174.) X-rays taken the following month were "normal." (R. at 249.) X-rays taken on November 4, 2003, December 4, 2003, January 9, 2004, and July 12, 2004, showed no infiltrates in his lungs and "[n]o significant change." (R. at 239–42.)

An ANA test conducted on November 25, 2008, to detect Plaintiff's antibody levels was "negative," indicating there was no sign of an opportunistic infection. (R. at 238.)

        b.      <u>Evidence During the Relevant Disability Period</u>

After his release from prison on May 18, 2010, Plaintiff saw Katia Brown, M.D. at Amelia Court Clinic in Parkland on June 25, 2010, for his HIV. (R. at 252.) Dr. Brown opined that Plaintiff

---

[8] "Expectorated matter, especially mucus or mucopurulent matter expectorated in diseases of the air passages." *Stedman's Medical Dictionary* at 1816.

4

was "stable", and noted that his CD4 count was 375, his HIV viral load[9] was less than 48, and he was "taking medications to treat [his] HIV."[10] (*Id.*) She also found that his hepatitis C remained "untreated" and referred him to another physician "for consideration of treatment." (R. at 255.) She concluded that "PCP prophylaxis [was] not necessary" at the time. (*Id.*) During a check up at Amelia Court Clinic on August 3, 2010, Plaintiff's CD4 count was 370 and his viral load was less than 48. (R. at 260.) He reported adhering to his medication regimen. (*Id.*)

Teresa Fox, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's treatment records and completed a Physical Residual Functional Capacity (RFC) Assessment on August 20, 2010. (R. at 308–15.) She determined that Plaintiff had the following physical RFC: lift and carry 20 pounds occasionally and 10 frequently; stand, walk, and sit for about six hours in an eight-hour workday; push and pull an unlimited amount of weight with hand and foot controls; and no postural, manipulative, visual, communicative, or environmental limitations. (R. at 309–12.) She further concluded that a PCP diagnosis was "not confirmed" by the medical evidence of record. (R. at 315.) On September 15, 2010, John Durfor, M.D., another SAMC, reviewed the evidence and agreed with Dr. Fox's assessment. (R. at 326.) He found important Dr. Brown's findings on June 25, 2010, that Plaintiff's CD4 count was 370 and his viral load was less than 48. (*Id.*)

On September 27, 2010, Dr. Brown examined Plaintiff and completed a form titled "Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection." (R. at

---

[9] HIV viral load is "a standard procedure to monitor the course of AIDS. Reported as the number of copies of viral RNA per mL of plasma, assessment of viral load provides important information about the number of lymphoid cells actively infected with HIV." *Stedman's Medical Dictionary* at 1113.

[10] Nurse notations indicate that Plaintiff was treating his HIV infection with HAART (or highly active antiretroviral therapy). (R. at 358.)

188–90, 356.) That day, Plaintiff's CD4 count was 363 and his viral load was less than 48. (R. at 356.) Plaintiff was still compliant with his medications, and the "Active Problem List" consisted of his HIV infection, hepatitis C, and "[t]obacco abuse." (R. at 357.) He had no fever, but complained of having low energy, fair appetite, and weight loss. (*Id.*) His lungs were "clear to auscultation bilaterally." (R. at 358.) In the form, Dr. Brown indicated that Plaintiff had an HIV infection and was diagnosed with PCP in 2002. (R. at 188.) She also noted that on May 21, 2002, Plaintiff's CD4 count was 154 and his viral load was 737,000, but by May 25, 2010, his CD4 count was 370 and his viral load was less than 48. (R. at 190.) Plaintiff returned to Amelia Court Clinic on December 22, 2010, for a routine follow-up. (R. at 353.) His CD4 count was 368 and his viral load was less than 50. (R. at 358.) The diagnoses were HIV infection (symptomatic), palpitations, and HIV disease. (R. at 359.) Dr. Brown continued his medications, but again opined that PCP prophylaxis was "not necessary." (R. at 358.)

    **3.    Hearing Testimony**

On March 8, 2011, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 24–42.) Plaintiff was represented by an attorney. (R. at 25.)

    *a.    Plaintiff's Testimony*

Plaintiff testified that he was 42 years old, measured five feet and eight or nine inches tall, and weighed 150 pounds. (R. at 25–26.) He was unemployed, and in the past had worked installing windows, loading and unloading shipments, and doing maintenance. (R. at 26.)

Plaintiff initially filed for disability benefits because he was unable to bend his left hand after his ligaments were damaged in a car accident. (R. at 27.) In addition, he was diagnosed with AIDS and PCP in 2002. (R. at 28–29.) As a result of his PCP, his left lung had collapsed and he

experienced chest pains and shortness of breath. (R. at 28.)

During the day, Plaintiff primarily sat around and slept because he suffered from insomnia at night. (R. at 27.) His medications caused him to use the restroom frequently, gave him rashes and "discharge of blood," and "a whole bunch of [other] things." (R. at 27–28.)

Plaintiff stopped working when he was incarcerated in 2001, and he remained in prison until 2010. (R. at 29–30, 40.) He could not work while he was in prison due to his constant dizziness and shortness of breath. (R. at 30.) Currently, he could not perform any of his previous jobs because he often "pass[ed] out", became "real dizzy," had chest pain, and was lethargic. (R. at 31.) He also had "broken bones in [his] feet [and] deformities in [his] toes." (*Id.*) He had surgery to remove bunions from his feet and planned to see a podiatrist to treat his broken bones and deformities. (*Id.*)

### b. *The VE's Testimony*

The VE classified Plaintiff's past relevant work as a warehouse worker (medium, unskilled, SVP-2). (R. at 34.) The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform his past relevant work with following RFC:

> [R]educed range of light work, with all of the postural functions at frequent level or below; that's climbing, balancing, stooping, kneeling, crouching, [and] crawling. With environmental limitations precluding all but frequent exposure to the elements of weather, cold, hot, wet, humid environments, vibration, moving mechanical parts, electric shock, hazardous exposed places, radiation, explosive, fumes, odors, dusts, gases, [and] poor ventilation. With manipulative limitations relating to the use of [the] non-dominant upper extremity left hand, left arm . . . [T]hose would be at the frequent level for reaching, handling, fingering, [and] feeling. With mental limitations precluding all but minimal contact with public, coworkers, [and] supervisors.

(R. at 34–35.) The VE opined that the hypothetical person could not perform Plaintiff's past relevant work. (R. at 35.) When the ALJ asked the VE whether there were other jobs that the person could perform, the VE answered in the affirmative and listed the following examples: (1)

mail clerk (light, unskilled, SVP-2), with 800 jobs in Texas and 11,600 in the national economy; (2) photocopy machine operator (light, unskilled, SVP-2), with 1,200 jobs in Texas and 13,200 in the national economy; and (3) production worker, such as a garment sorter, (light, unskilled, SVP-1 or 2), with 12,100 jobs in Texas and 218,400 in the national economy. (R. at 35–36.)

The ALJ then modified the hypothetical to limit the individual to a "reduced range of sedentary work, with all of the postural functions [such as climbing, balancing, etc.] at the occasional level." (R. at 36.) The VE opined that the hypothetical person could perform sedentary manufacturing and production jobs, such as a final assembler, an office clerk, a document preparer, and a surveillance system monitor. (R. at 37.)

The ALJ modified the hypothetical again, limiting the individual to "[n]o more than occasional . . . reaching, handling, fingering, [and] feeling" with the "non-dominant upper extremity." (R. at 38.) According to the VE, the hypothetical person could still perform the surveillance system monitor job. (*Id.*) In response to a question by the ALJ, the VE stated that the hypothetical person could not maintain competitive employment if he missed two or more days of work a month or took unscheduled breaks "over and above normal breaks" and lunch periods. (R. at 38.) She also explained that the person would not be allowed to "lie down at will." (*Id.*)

Counsel asked the VE whether any of the jobs she had identified would allow the hypothetical person to take four breaks a day "to use the restroom" or miss work three days a week "because of nausea or vomiting." (R. at 39.) The VE responded in the negative. (R. at 39–40.)

C.  **ALJ's Findings**

The ALJ issued his decision denying benefits on April 12, 2011. (R. at 10–18.) At step one, he found that Plaintiff had not engaged in substantial gainful activity (SGA) since May 19, 2010,

8

his application date. (R. at 12.) At step two, he found that Plaintiff had four severe impairments: AIDS, pneumonia, left hand injury, and depression. (*Id.*) At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal any impairment listed in the regulations. (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the following RFC: lift and carry a maximum of 20 pounds; frequently climb, balance, stoop, kneel, crouch, and crawl; frequently reach, handle, finger, and feel with the non-dominant left upper extremity and no limitations in the dominant right upper extremity; tolerate frequent exposure to extreme heat or cold, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, moving mechanical parts, electrical shock, hazardous exposed places, radiation, and explosives; and limited to minimal contact with the public, coworkers, and supervisors. (R. at 14.)

At step four, with the VE's testimony, the ALJ determined that Plaintiff could not perform his past relevant work. (R. at 17.) At step five, also based on the VE's testimony, the ALJ determined that considering Plaintiff's age, education, work experience, and RFC, he could perform other jobs existing in the national economy, including mail clerk, photocopy machine operator, and production worker (e.g. garment sorter). (R. at 18.) Accordingly, the ALJ concluded Plaintiff was not disabled at any time between his application date and the date of the ALJ's decision. (*Id.*)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir.1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Accordingly, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.
2. An individual who does not have a "severe impairment" will not be found to be disabled.
3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.
4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.
5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at

any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

In the alternative to remand, Plaintiff asks the Court to reverse the case and direct the Commissioner to find him "disabled, and entitled to SSI benefits" since June 1, 2010. (Pl. Br. at 14.)

If an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). Inconsistencies and unresolved issues in the record therefore preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam).

### B. Issue for Review

Plaintiff presents one issue for review:

> The decision must be reversed for the payment of benefits because the listing discussion in the decision is not based on substantial evidence and contains errors of law; the plaintiff's impairment meets the criteria of the listing.

(Pl. Br. at 2.)

### C. Listed Impairment

Plaintiff contends that the ALJ's step three finding that his HIV infection did not meet listing 14.08B7 "lacks substantial evidence and is in fact plain legal error" because he improperly "fail[ed] to note" certain evidence from Plaintiff's hospitalizations in March, April, and May 2002 that

12

confirmed his PCP diagnosis.  (Pl. Br. at 8, 11.)

### 1.  Listing 14.08B7  Requirements

The listed impairments in the Social Security regulations "are descriptions of various physical and mental illnesses . . . most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990).  "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Id.* at 530.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* (emphasis in original).  The specified medical criteria are designed to be demanding and stringent because they lead to a presumption of disability, making further inquiry unnecessary. *Id.* at 532; *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).  The claimant bears the burden of proving that his impairments meet or medically equal the criteria found in the Listings. *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).  If a claimant fails to meet this burden, the ALJ's finding is supported by substantial evidence. *Henson v. Barnhart*, 373 F. Supp. 2d. 674, 685 (E.D. Tex. 2005) (citing *Selders*, 914 F.2d at 620).

Listing 14.08 provides the severity criteria for HIV infection. *See* 20 C.F.R. part 404, subpt. P, appendix 1 § 14.08.  To meet listing 14.08B7, a sub-category of listing 14.08, the claimant must suffer from a documented HIV infection "as described in 14.00F," as well as from PCP, an opportunistic "fungal" infection. *Id.* § 14.08B7. In turn, § 14.00F, requires *both* documentation of the HIV infection *and* documentation of the *manifestation*s of the HIV infection, i.e., of the PCP infection.[11] *Id.* § 14.00F.  PCP documentation may consist of "definitive documentation" (or "laboratory evidence") such as a culture, serologic test, microscopic examination, bronchial

---

[11] The parties do not dispute that Plaintiff's HIV infection was sufficiently documented.  (*See* Pl. Br. at 9; D. Br. at 5–6.)  Accordingly, only the second requirement, the "manifestations" of the infection, is discussed.

13

washings, induced sputum, or a lung biopsy. *Id.* § 14.00F3a–b(i). Alternatively, a PCP diagnosis may be established "presumptively" with "supportive evidence" (the symptoms of the disease), such as "[f]ever, dyspnea, hypoxia, CD4 count below 200, [] no evidence of bacterial pneumonia, . . . bilateral lung interstitial infiltrates on x-ray, a typical pattern on CAT scan, [] a gallium scan positive for pulmonary uptake," or a positive "[r]esponse to anti-PCP therapy." *Id.* § 14.00F3b(i).

### 2. *PCP Documentation in Plaintiff's Case*

Plaintiff argues that the treatment notes from his hospitalizations in March, April, and May 2002 (over eight years prior to his application date) presumptively documented the manifestations of his HIV infection because his symptoms on those occasions showed he had PCP pursuant to § 14.00F3b(i). (Pl. Br. at 10–11.)

Under Title XVI, a "claimant cannot receive payment for [SSI] for any time prior to the application [date], regardless of the length of the disability."[12] *Slaughter v. Astrue*, 857 F. Supp. 2d 631, 635 n. 42 (S.D. Tex. 2012) (citing 20 C.F.R. § 416.335;[13] *Brown v. Apfel,* 192 F.3d 492, 495 n. 1 (5th Cir. 1999)). Accordingly, even if the claimant was disabled before his application date, to qualify for SSI payments, he must show that he was still disabled between his application date and the date of the ALJ's decision. *See Plaisance v. Astrue*, CIV.A. 07-8242, 2008 WL 4808852, at *1

---

[12] The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. §§ 423(d)(1)(A) (West 2012).

[13] Section 416.335 provides:
When you file an application in the month that you *meet all the other requirements for eligibility* [i.e., disability], the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first *meet all the other requirements for eligibility*, we cannot pay you for the month in which your application is filed or any months before that month.
20 C.F.R. § 416.335 (2012) (emphasis added).

14

(E.D. La. Oct. 31, 2008) (explaining that because "the month following an application . . . fixes the earliest date from which benefits can be paid," "the relevant time period for any period of disability is [the application date] through the date of the ALJ's decision") (citations omitted); *accord Griffith v. Colvin*, No. CIV.A. 6:13-23-DCR, 2013 WL 5536476, at *3 n.1 (E.D. Ky. Oct. 7, 2013) ("The period to evaluate [the claimant's] SSI claim start[ed] when she filed her SSI application . . . and continued to the date of the ALJ's decision. . . .") (citations omitted).[14] The medical evidence dating before the application date is therefore generally irrelevant to a Title XVI claim. *See Titles II & XVI: Onset of Disability*, SSR 83-20, 1983 WL 31249, at *7 (S.S.A 1983) ("[S]pecific medical evidence of the exact onset date need not generally be obtained *prior to the application date* since there is no retroactivity of payment because title XVI payments are made beginning with the date of application provided that all conditions of eligibility are met."); *see also Slaughter*, 857 F. Supp. 2d at 643 (evidence concerning events prior to the claimant's application date may be properly disregarded because such evidence is "outside the relevant period of disability").

Nonetheless, to make the record "complete," the regulations permit the claimant to submit medical evidence from the 12 months preceding his application date, "unless there is a reason to believe that development of an earlier period is necessary . . ." 20 C.F.R. § 404.1512(d). SSR 83-20 provides examples of the "instances where it is necessary to establish that disability has existed for several consecutive months . . . *immediately prior to the date of filing*," including where "medical documentation prior to application date is relevant to an assessment of severity/duration in the impairment category involved, e.g., myocardial infarction, cirrhosis, certain mental conditions, or

---

[14] By contrast, the relevant disability period for DIB claims under Title II begins on the claimant's alleged onset date and runs through the date he was "last insured." *See Slaughter*, 857 F. Supp. 2d at 635 n. 41 (citing *Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000)).

15

for some dual title II-XVI claims where an earlier onset must be established for the title II claim." SSR 83-20, 1983 WL 31249, at *8 (emphasis added).

Here, the relevant disability period for determining Plaintiff's Title XVI claim began on May 19, 2010, his application date, and ended on April 12, 2011, the date of the ALJ's decision. *See Plaisance*, 2008 WL 4808852, at *1. Since Plaintiff has not alleged that any of the conditions listed in SSR 83-20 apply in this case, any evidence dating prior to his application date was irrelevant to his claim. *See Slaughter*, 857 F. Supp. 2d at 643; SSR 83-20, 1983 WL 31249, at *8. Ultimately, even assuming that it was "necessary" to include the treatment notes from the 2002 hospitalizations to make the record "complete", and that those notes showed Plaintiff's HIV infection met the criteria of § 14.00F3b(i) at that time, he had the burden of showing that his HIV infection continued to meet the requisite criteria at least as of May 19, 2010, his application date, to qualify for SSI. *See* 20 C.F.R. § 416.335; *Selders*, 914 F.2d at 619.

At step three, the ALJ determined that Plaintiff's HIV infection did not meet or medically equal the requirements of §§ 14.00F3(a) or 14.08B7 "because there [was] no definitive documentation of a manifestation" of his HIV infection. (R. at 13.) In his narrative discussion, the ALJ referenced an X-ray of Plaintiff's lungs taken on March 24, 2002, as well as Dr. Allen's differential diagnosis of PCP on that date, but concluded that the PCP diagnosis "was never actually confirmed." (R. at 13, 206.) He considered important that X-rays taken in 2004 "showed no active infiltrates in [Plaintiff's] lungs," and noted the opinion of Dr. Brown, Plaintiff's treating physician, on June 25, 2010, that PCP prophylaxis was "not even necessary." (R. at 13, 239–42, 255.)

The ALJ's written opinion did not discuss or even mention Plaintiff's symptoms during his March 2002 hospitalization: shortness of breath, fever, a dry cough, chest pain, vomiting, loss of

16

appetite, weight loss, and a CD4 count of 22. (R. at 12–13, 206–10.) Neither did the ALJ's decision mention Plaintiff's hospitalizations on April 17, and May 2, 2002, during which he again exhibited several of the PCP symptoms listed in §14.00F3b(i).[15] (*See* R. at 193, 199, 202, 214.) Nevertheless, the ALJ's omission of this evidence was not erroneous because it predated Plaintiff's application date of May 19, 2010, and was therefore outside of the relevant disability period. *See Slaughter*, 857 F. Supp. 2d at 643 (holding that the ALJ "properly disregarded" evidence that was outside of the relevant period of disability regarding the claimant's SSI claim).

Moreover, Plaintiff has failed to identify evidence in the record showing he had PCP, or any other opportunistic infection listed in 14.08A–K, during the time period at issue. As previously noted, PCP is a curable fungal infection, and Plaintiff was treated for it with Bactrim in April 2002. (*See* R. 214.) No inference can be made that any PCP infection that may have been diagnosed in 2002 persisted until the time of Plaintiff's application.[16] Further, X-rays taken on October 21, 2003, showed there were "no active infiltrates" in his lungs. (R. at 239.) The same findings were observed in X-rays taken on November 4, 2003, December 4, 2003, January 9, 2004, and July 12, 2004. (*See* R. at 239–42.) On June 25, 2010, Dr. Brown found that Plaintiff was "stable," his CD4 count was 375 and his HIV viral load was less than 48, and she opined that PCP prophylaxis was not necessary. (R. at 252–55, 258.) By early August 2010, Plaintiff's CD4 was 370 and his HIV viral load

---

[15] For example, on April 17, 2002, Dr. Allen and two other physicians from NTHS opined that Plaintiff's condition was "most likely" PCP. (R. at 193, 199, 214.) Notably, although they administered Bactrim intravenously to treat PCP, they also treated Plaintiff "empirically" with antibiotics for "possible bacterial" pneumonia. (R. at 214.) On May 2, 2002, chest X-rays showed diffuse interstitial infiltrates in Plaintiff's lungs, which were indicative of an "opportunistic infection such as PCP," and the discharge diagnoses from NTHS included PCP. (R. at 202.)

[16] In fact, in a disability report Plaintiff submitted some time after October 1, 2010, he did not list any medications used to treat PCP and listed only the medications he was taking for his HIV infection. (*See* R. at 181.)

remained less than 48. (R. at 260). On September 27, 2010, Plaintiff's CD4 count was 363 and his viral load was still less than 48. (R. at 356.) That day, Dr. Brown opined that PCP prophylaxis remained unnecessary, and indicated that the only "active problems" were Plaintiff's HIV infection, hepatitis C, and tobacco abuse. (R. at 357.) In the standard form she completed, Dr. Brown indicated that as of May 21, 2002, Plaintiff's CD4 count was 154 and his viral load was 737, 000, but by May 25, 2010, his CD4 count was 370 and his viral load was less than 48. (R. at 190.) By the end of that year, Plaintiff's CD4 count and viral load remained unchanged. (R. at 358.)

Because Plaintiff failed to meet his step three burden to provide documentation of the manifestations of his HIV infection, i.e., of his PCP diagnosis, during the relevant disability period for his SSI claim, he failed to show that his HIV infection met all of the criteria of §14.08B7. Accordingly, the ALJ's step three finding that Plaintiff was not disabled between the date of his application and the date of the ALJ's decision is supported by substantial evidence, and remand is not required. *See Angell-Murray v. Comm'r of Soc. Sec.*, No. 2:12-CV-2604-KJN, 2013 WL 6086858, at *8 (E.D. Cal. Nov. 19, 2013) (holding that substantial evidence supported the "ALJ's determination that [the] plaintiff did not meet or medically equal a listing" where the "plaintiff had suffered from serious heart impairments around the time of her birth, [but] the record evidence plainly [did] not show that [she] met or medically equaled all of the requirements of [the relevant listings] during the period relevant to [her] [SSI] application"); *compare to Gonzalez v. Barnhart*, 491 F. Supp. 2d 329, 335–36 (W.D. N.Y. 2007) (holding that the ALJ's finding that the claimant's HIV infection did not meet listing 14.08D2a was "erroneous" and required remand because the "record [was] replete with mention of [the] plaintiff's HSV [herpes] infection," and "[a]lmost all of

18

the progress notes from [her] treating physicians indicate[ed] [that her] *recurrent* HSV [was] a significant *ongoing* concern"—including during the time period between her application date and the date of the ALJ's decision) (emphasis added).

### III. RECOMMENDATION

Plaintiff's motion should be **DENIED,** Defendant's motion should be **GRANTED,** and the case should be wholly **AFFIRMED.**

**SO RECOMMENDED,** on this 10th day of January, 2014.

                                             IRMA CARRILLO RAMIREZ
                                             UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

                                             IRMA CARRILLO RAMIREZ
                                             UNITED STATES MAGISTRATE JUDGE